# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 129

### OCTOBER TERM, A.D. 2023

December 29, 2023

JAMES L. HYATT,

Appellant
(Defendant),

v.                                                              S-23-0117

TARA M. HYATT,

Appellee
(Plaintiff).

*Appeal from the District Court of Sweetwater County*
The Honorable Richard L. Lavery, Judge

*Representing Appellant:*
    Hilary K. Brewster, Rock Springs, Wyoming.

*Representing Appellee:*
    Crystal D. Stewart, Devon P. O'Connell, Pence and MacMillan LLC, Laramie, Wyoming.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ, Justice.**

[¶1]    The district court granted James L. Hyatt (Father) and Tara M. Hyatt (Mother) a divorce, awarded Mother custody of their two minor children, ordered Father to pay child support, and divided the marital property.  Father appeals, challenging the court's division of the property and its child support and custody decisions.  We affirm.

## ISSUES

[¶2]    Father raises three issues which we restate as follows:

1.    Did the district court abuse its discretion when dividing the marital property?

2.    Did the district court incorrectly determine Father's net monthly income for the purposes of calculating child support?

3.    Did the district court err by awarding Mother custody of the children?

## FACTS

[¶3]    Father and Mother married on September 13, 2015.  They have two children, a son, HRH, born in August 2011, and a daughter, HAH, born in January 2018.  During most of the marriage, Father was self-employed at Never Summer Express, LLC (NSE), a long-haul trucking company.  As a long-haul trucker, Father was out of town during the week.  Mother stayed home with the children and homeschooled HRH.

[¶4]    In December 2018, Father added Mother as a signer on NSE's business bank account, and she became a 50 percent owner of NSE in February 2019.  Mother was not personally compensated during the marriage for her ownership interest other than by having access to the money transferred from NSE's business bank account to her and Father's personal bank account.  During most of the marriage, Father withdrew $8,800 from NSE each month ($4,800 as salary and $4,000 as an owner's withdrawal), totaling $105,600 per year.  The rest of NSE's earnings remained in its business bank account.

[¶5]    In July 2019, Mother began receiving disturbing text messages from anonymous phone numbers on her personal cell phone.  She believed the messages came from Father because their content resembled the way he spoke to her during the marriage (i.e., "devaluing, lots of blame, just really mean") and they contained information only he would know.  However, when confronted, he denied sending the messages.  In December 2020, Mother hired a private investigator (PI) to determine the source of the messages.  The PI completed his investigation in April 2021 and concluded Father had sent the messages.

1

[¶6]     Three months later, on July 24, 2021, Father removed Mother as a signer on NSE's business bank account, cut off her ability to use the parties' joint credit card, and withdrew $8,000 from the parties' joint checking account, leaving Mother with $9,800. Due to these circumstances and the harassing text messages, Mother did not feel safe around Father so she and the children moved out of the marital home and into a safe house for fourteen weeks. While living in the safe house, Mother allowed the children to call or FaceTime with Father each day but did not allow him physical contact with the children until October 2, 2021. On that date, Mother allowed HRH to stay the night with Father at the marital home. Since that time, HRH has regularly stayed with Father every other weekend, first at the marital home and then at Father's two-bedroom apartment. Although HAH began visiting Father on October 2, 2021, she had not spent the night at his house by the time of the trial in August 2022.

[¶7]     In August 2021, Mother filed a complaint for divorce and Father counterclaimed for divorce. Both parties sought custody of the children, child support, a just and equitable division of the marital property, and attorney fees. Mother also requested alimony during the pendency of the divorce proceedings. Two months later, the parties agreed Father would move out of and Mother and the children would move back into the marital home. Father agreed to pay all household expenses, including the mortgage, not to exceed $2,300 per month, from November 1, 2021, to February 1, 2022.

[¶8]     In December 2021, Mother asked the district court for temporary possession of the marital home, temporary custody of the children, temporary child support and alimony, and an order requiring Father to pay her attorney fees. Father opposed Mother's requests and filed a counter motion for possession of the marital home and visitation with both children every other weekend. The court heard the motions and entered an order granting Mother temporary possession of the marital home and temporary custody of the children subject to Father's visitation every Wednesday evening from 5 p.m. to 7 p.m. and every other weekend. It also ordered Father to pay Mother $6,000 per month in alimony and child support for four months (May 2022 to August 2022) and $10,000 for her attorney fees.

[¶9]     After a bench trial in August 2022, the district court granted the parties a divorce, divided the marital property, and awarded Mother custody of the children. It granted Father visitation every other weekend from Thursday to Sunday, two hours on Wednesdays during the off weeks, and half the summer. The district court ordered Father to pay $2,327 per month in child support, $3,673 in monthly alimony from November 2022 through August 2023, and $20,000 of Mother's attorney fees and costs. Father timely appealed.

[¶10]   We will provide additional facts, as necessary, in the discussion of the issues.

## DISCUSSION

### Property Division

[¶11] We review the district court's division of marital property, including its decision to award alimony, for an abuse of discretion. *Conzelman v. Conzelman*, 2019 WY 123, ¶ 15, 453 P.3d 773, 778 (Wyo. 2019). "The ultimate question in determining whether an abuse of discretion occurred is whether the trial court could have reasonably concluded as it did." *Metz v. Metz*, 2003 WY 3, ¶ 6, 61 P.3d 383, 385 (Wyo. 2003) (citing *Horn v. Welch*, 2002 WY 138, ¶ 8, 54 P.3d 754, 758 (Wyo. 2002)). "We will not disturb a property division in a divorce case, except on clear grounds, as the trial court is usually in a better position than the appellate court to judge the parties' needs and the merits of their positions." *Id.* (citing *Paul v. Paul*, 616 P.2d 707, 712 (Wyo. 1980), and *Warren v. Warren*, 361 P.2d 525, 526 (Wyo. 1961)). An abuse of discretion will be found, however, "when 'the property disposition shocks the conscience of this Court and appears to be so unfair and inequitable that reasonable people cannot abide it.'" *Innes v. Innes*, 2021 WY 137, ¶ 16, 500 P.3d 259, 262 (Wyo. 2021) (quoting *Malli v. Malli*, 2020 WY 42, ¶ 14, 460 P.3d 245, 249 (Wyo. 2020), and *Long v. Long*, 2018 WY 26, ¶ 22, 413 P.3d 117, 125 (Wyo. 2018)).

[¶12] The district court awarded Mother the marital home valued at $500,000 ($216,000 of which was equity), a $90,000 residential lot purchased by the parties during the marriage, her vehicle (a 2020 Ford F-150 truck), her $8,000 wedding ring, and her $27,894.63 retirement account with the City of Rock Springs. It valued NSE at $149,000 and gave it to Father. Father also received his $2,567.66 retirement account, his vehicle (a 2019 Ford F-350 truck), the gun safe, and various tools, guns, and ammunition. The court made Mother responsible for the $1,740.90 monthly mortgage on the marital home and her $12,683.19 Wells Fargo Visa credit card debt. It made Father responsible for his $2,835.41 Capital One Visa credit card debt and directed him to pay Mother's American Express credit card debt totaling $22,145. Although it considered its award of extra property to Mother to be a "partial substitute for alimony," the court found Father had the ability to pay alimony and Mother was "in need of continued temporary support for a short period to allow [her] an opportunity . . . to establish . . . self-employment or other employment." It also took into consideration that Mother had already begun homeschooling HRH for the 2022-2023 school year and would need time to address whether that would continue. Consequently, the district court ordered Father to pay $3,673 in monthly alimony from November 2022 through August 2023. Finally, the court determined Father should pay $20,000 of Mother's attorney fees because they were necessary for her to carry on and defend the divorce proceedings.

[¶13] The district court recognized its division of the property was unequal but concluded such division was equitable under the circumstances given the condition in which the parties would be left by the divorce, the fact the parties chose for Mother to leave

3

established employment to be a homemaker and the children's caretaker, and the burdens imposed on the property for the benefit of the children.

[¶14] Father argues the district court abused its discretion when dividing the marital property. He challenges the court giving a majority of the property to Mother, the award of alimony, the requirement that he pay Mother's American Express credit card debt, and the court's attorney fees order. We address each argument in turn.

### *Majority of Property to Mother*

[¶15] Father claims the evidence does not support the district court giving Mother a majority of the marital property. He points to the short duration of the marriage, Mother's unilateral decision to quit her job so she could stay home with the children and homeschool HRH, and the fact he contributed more pre-marital assets to the marriage than Mother. He maintains the court should have equally divided the property.

[¶16] The disposition of marital property in a divorce is governed by Wyo. Stat. Ann. § 20-2-114(a) (LexisNexis 2023) which states in relevant part:

> [I]n granting a divorce, the court shall make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens imposed upon the property for the benefit of either party and children.

"There are no specific guidelines as to the weight the district court must afford the statutory considerations when making a property division." *Malli*, ¶ 16, 460 P.3d at 249 (citing *Wallop v. Wallop*, 2004 WY 46, ¶ 26, 88 P.3d 1022, 1030 (Wyo. 2004); *Paul*, 616 P.2d at 712). Although § 20-2-114(a) contemplates a distribution that is "just and equitable," it "does not require an equal division of property, and we have said a just and equitable division is as likely as not to be unequal." *Dutka v. Dutka*, 2023 WY 64, ¶ 44, 531 P.3d 310, 323 (Wyo. 2023) (citations and internal quotation marks omitted). "The equity of a district court's property division is evaluated 'from the perspective of the overall distribution rather than from a narrow focus on the effects of any particular disposition.'" *Id.* (quoting *Innes*, ¶ 17, 500 P.3d at 262, and *Stevens v. Stevens*, 2014 WY 23, ¶ 11, 318 P.3d 802, 807 (Wyo. 2014)).

[¶17] Given the evidence before it, the district court did not abuse its discretion when determining that an unequal distribution of the property was just and equitable in this case.

[¶18] The parties were married for almost six years prior to their separation. However, they lived together for over ten years. The parties initially lived in Father's pre-marital home. They sold that home and used the proceeds to purchase and remodel the marital home. Mother used Father's pre-marital vehicle during most of the marriage. Nevertheless, Mother also contributed pre-marital assets to the marriage. She sold her pre-marital home and used a portion of the sale proceeds "to pay for a very large part" of the parties' "very expensive" wedding and to purchase the vacant residential lot. Moreover, although Father used a portion of his retirement account from a previous employer to help pay for the parties' wedding and the residential lot, he used a larger portion of the retirement account and all of a pension to start and expand NSE, which he was awarded in the property division.

[¶19] Mother has a degree in architectural studies and was working full-time as a building inspector for the City of Rock Springs earning approximately $29 per hour when the parties met in the Spring of 2010. She left that job when HRH was six months old and stayed home with him for two years. At that time, she began working part-time at a local architecture firm earning $20 per hour. She quit that job six months after the parties' marriage in September 2015 and has not worked outside of the home since that time. Mother testified the parties agreed she would stay home with the children. Father claims Mother unilaterally decided to quit her job as a building inspector and promised to supplement the lost income by opening an in-home daycare, but she did not. The district court decided which party made the decision for Mother to stay home with the children was irrelevant and we agree. The reality was that during the marriage, Mother did not work outside the home while Father provided for the family through NSE. Father was awarded NSE in the property division, so he continues to have a steady source of significant income. In contrast, Mother has no income and must find employment given her role as a stay-at-home mother during the marriage. Consequently, there was a reasonable basis for the district court to conclude as it did, and we cannot find such conclusion was an abuse of discretion. *Cf. Malli*, ¶ 17, 460 P.3d at 249-50 (finding no abuse of discretion where district court awarded wife a 160-acre parcel gifted to husband by his parents where husband received most of the business assets and therefore "he will be able to continue operating his businesses as he has in the past" while the wife would have to find "a completely new income stream" given her inconsistent employment history outside the family businesses and her role as a stay-at-home mother).

### *Alimony*

[¶20] The same statute that governs the division of marital property also provides for an award of alimony:

> The court may decree to either party reasonable alimony out of
> the estate of the other having regard for the other's ability to
> pay and may order so much of the other's real estate or the rents

and profits thereof as is necessary be assigned and set out to either party for life, or may decree a specific sum be paid by either party.

Section 20-2-114(a). "'The purpose of alimony is to provide a post-divorce substitute for the support provided to a spouse during the marriage'" when the spouse is "'unable to adequately provide for . . . herself.'" *Kamm v. Kamm*, 2016 WY 8, ¶ 10, 365 P.3d 779, 782 (Wyo. 2016) (quoting *Stevens*, ¶ 15, 318 P.3d at 807). "An award of property is a preferable modern substitute for alimony. . . . When alimony is awarded in the absence of a stipulated settlement between the parties, the record must reflect some evidence that alimony, with its special features, is needed. If the intent is to adjust the equities between the parties at the time of the divorce, property division, which may encompass a series of payments, is the preferable method." *Johnson v. Johnson*, 11 P.3d 948, 951 (Wyo. 2000) (citations omitted). "'[U]nder ordinary circumstances[,] . . . one spouse should not have a perpetual claim on the earnings of the other [and a] divorce . . . should sever the ties of the parties and they should begin to start their lives anew.'" *Stevens*, ¶ 15, 318 P.3d at 807-08 (quoting *Belless v. Belless,* 2001 WY 41, ¶ 8, 21 P.3d 749, 751 (Wyo. 2001), and *Grosskopf v. Grosskopf*, 677 P.2d 814, 821 (Wyo. 1984)). However, in some cases, "'alimony may be a necessity.'" *Id*. (quoting *Belless,* ¶ 8, 21 P.3d at 751). Whether a spouse is entitled to alimony turns on "the ability of the payor spouse to pay and the necessity of support for the payee." *Neville v. Neville*, 8 P.3d 1072, 1073 (Wyo. 2000) (citing *Sellers v. Sellers*, 775 P.2d 1029, 1032 (Wyo. 1989)).

[¶21] Father complains that the district court awarded alimony without making any findings regarding his ability to pay. He also argues alimony was unwarranted after February 2022 because Mother did not need support. The essence of his claim that Mother did not need support is that, in his opinion, she should have found employment while the divorce case was pending.

[¶22] Father is incorrect when he states the district court awarded alimony without making any findings that he had the ability to pay. The district court determined Father had the ability to pay alimony. To the extent Father believes the court should have made more specific findings supporting that determination, neither party requested special findings of fact and conclusions of law pursuant to Rule 52(a)(1)(A) of the Wyoming Rules of Civil Procedure. "When no such request is made, 'it shall not be necessary for the court to state its findings, except generally for the plaintiff or defendant.'" *Begley v. Begley*, 2020 WY 77, ¶ 25, 466 P.3d 276, 284 (Wyo. 2020) (quoting Rule 52(a)(1)). In any event, the evidence supported the district court's determination that Father had the ability to pay alimony. Father had been operating NSE since December 2018. He withdrew $8,800 per month from NSE during the marriage. He left NSE's remaining income in its business bank account. At the time of the parties' separation, NSE had approximately $85,000 in its business bank account and, at the time of trial, approximately $53,000. Given the district court awarded Father NSE, he continued to have access to that income stream.

6

[¶23] Turning to Mother's need for support, the evidence showed Mother was not employed between the parties' separation and the trial. However, the evidence does not support Father's claim that she was unwilling to support herself financially. Once Mother learned Father had removed her as a signer on NSE's business bank account and cut her off from using the parties' joint credit card, she moved out of the marital home and into a safe house with the children for fourteen weeks. After leaving the safe house and moving back into the marital home in October 2021, Mother sought employment in the architecture field. When her online job search proved unsuccessful, she inquired with the City about returning to her former position as a building inspector, but the City did not have any open positions. She also approached the architecture firm where she previously worked, which offered her a position making $20 per hour. She rejected the offer because it would not make economic sense for her to accept employment at that wage given the cost of placing the children in daycare.

[¶24] Mother explained her efforts to find employment to the district court. The court told Mother she should not expect long-term alimony, she "needed to get on [her] feet," and she would probably "need to go out in the world to work." Mother heeded the court's advice. By the time of trial, Mother had completed all steps necessary to open an in-home daycare the following week. She acknowledged, however, that she did not yet have children to watch and it would take time to build up the daycare. Given Mother was in the process of establishing an in-home daycare business, it was entirely reasonable for the district court to determine an award of additional property and temporary alimony to Mother was warranted to allow her time to do so.

[¶25] *Stevens* is instructive. There, the district court ordered the father to pay the mother $2,000 in monthly alimony for five years. *Stevens*, ¶ 5, 318 P.3d at 805. The father appealed, arguing the mother, who maintained a tax and bookkeeping practice, was not in need of support. *Id.*, ¶ 14, 318 P.3d at 807. In affirming, we noted the large disparity in the parties' incomes. *Id.*, ¶¶ 5, 16, 318 P.3d at 805, 808. We also noted that while Mother had obtained her CPA license during the marriage, she had no significant business experience or established employment at the time of the divorce because she had only worked as a CPA for nine months during the marriage before having children and becoming a stay-at-home mother. *Id.*, ¶¶ 3, 16, 318 P.3d at 805, 808. Under these circumstances, we concluded the district court did not abuse its discretion by awarding the mother alimony.

> [I]t is entirely within the discretion of the trial court to award alimony during a transition period wherein the party requesting alimony may gain special skills, education, or experience to enable the party to raise his or her earning capacity. . . . Because of Mother's dedication as a stay at home mom the

period allowed for alimony [five years] allows her to regain her ground as an employable CPA.

*Id.*, ¶ 16, 318 P.3d at 808 (emphasis omitted). *See also, Hendrickson v. Hendrickson*, 583 P.2d 1265, 1268 (Wyo. 1978) ( because the mother was not employed during the marriage and had a young child at the time of the divorce, "a period of transition of four years, during which she would receive alimony assistance, does not appear unreasonable and was within the court's discretion upon the basis of the evidence before it"). Similarly, in this case, the district court reasonably found an additional ten months of alimony would allow Mother time to establish an in-home daycare or other employment, while also determining whether she could continue to homeschool HRH.

[¶26]   Father claims Mother did not need alimony because she had the equity in the marital home and could sell the residential lot. The district court acknowledged that an award of extra property is preferable to an award of alimony and awarded Mother extra property as a partial substitute for alimony. However, the court determined Mother needed support in addition to the property award. We cannot say this was unreasonable, especially since it would take time for Mother to refinance and/or liquidate the home and residential lot.

[¶27]   Father asserts the district court should not have found Mother to have a financial need because she had considered a divorce two years earlier and should have taken steps to improve her finances then. This argument is similar to Father's assertion that Mother should have found a job while the divorce was pending. Given the complex nature of the parties' relationship, it was reasonable for the district court to conclude as it did – that Mother had a temporary financial need for alimony.

### *American Express Credit Card Debt*

[¶28]   Father argues the district court abused its discretion by making him responsible for Mother's American Express credit card debt because it was incurred within 90 days after the parties' separation. He claims such post-separation debt is typically considered the responsibility of the party which incurred the debt.

[¶29]   Father cites no authority, and we have not uncovered any, for the proposition that post-separation debt is typically the responsibility of the party incurring it. Rather, for purposes of determining the appropriate date on which to value property and the effective date of the division of property, we have determined these matters are "within the broad and sound discretion of the trial court." *Wallop*, ¶ 11, 88 P.3d at 1025. "Thus, equitable factors may dictate a valuation date, and in order to do equity in dividing property in a divorce case, the trial court must be permitted to utilize alternative valuation dates, where reasonable under the facts and circumstances presented in the particular case, in order to make truly equitable awards consistent with the legitimate expectations of the parties." *Id.*, ¶ 12, 88 P.3d at 1027 (quoting 27B C.J.S., *Divorce* § 545) (emphasis omitted). "We

recognize that there are numerous factual situations which might warrant valuing the assets at a time other than the date of the filing of the divorce action. Some of those situations include: *post-separation changes in value due to the efforts of one party; a lack of financial involvement of one party; purposeful dissipation of assets subsequent to separation*; and bad faith efforts to delay a divorce proceeding." *Id.* (emphasis added). The same is true when the district court is dividing debt. When it is "valued" and what debt should be divided is within the sound discretion of the district court.

[¶30] In this case, the district court reasonably decided Father should pay Mother's American Express credit card debt, even though she incurred it after the parties' separation. The evidence showed that despite Mother having a 50 percent ownership interest in NSE, Father took it upon himself to remove Mother as a signer on NSE's business bank account on the date of separation, thereby depriving her of access to over $85,000. While he claimed he removed her as a signer because he believed she would take the money in the account, he admitted she had never withdrawn money from that account without his permission. He also, without warning, cut Mother off from her using the parties' joint credit card and left her with a mere $9,800 in their joint checking account. To pay her expenses after the parties' separation, Mother used her American Express credit card until Father agreed to and then was ordered by the court to provide her with support. As the district court aptly found, it was "reasonable" for Mother to have incurred this debt for personal expenses after the parties' separation and having Father pay it would "offset the limited support [he] provided between the separation of the parties and the temporary hearing."

### *Attorney Fees*

[¶31] After trial, Mother submitted a motion for attorney fees and costs pursuant to Wyo. Stat. Ann. § 20-2-111 (LexisNexis 2023) seeking $48,728.50 in attorney fees and $6,443.34 in costs. To the motion, she attached the affidavit of one of her attorneys which averred the charged hourly rates ($300 for one attorney and $200 for another attorney) were reasonable for attorneys with their years of experience in divorce litigation.

[¶32] The district court determined the attorneys' billings "appear[ed] to be accurate and fair, especially in light of the fact that counsel wrote off portions of the trial preparation in [the] exercise of billing judgment." Nevertheless, the court found the total sought was "disproportionate to the case and the marital estate." As a result, it denied Mother's request for $55,171.84 in attorney fees and costs and required Father to pay $20,000.

[¶33] Father argues the district court abused its discretion by ordering him to pay Mother's attorney fees and costs because they were excessive. He claims it was unreasonable for Mother to hire two attorneys and complains that much of their work was unnecessary.

[¶34] We review an award of attorney fees for an abuse of discretion. *McMurry v. McMurry*, 2010 WY 163, ¶ 17, 245 P.3d 316, 321 (Wyo. 2010). Section 20-2-111 provides:

> In every action brought for divorce, the court may require either party to pay any sum necessary to enable the other to carry on or defend the action and for support and the support of the children of the parties during its pendency. The court may decree costs against either party and award execution for the costs, or it may direct costs to be paid out of any property sequestered, in the power of the court, or in the hands of a receiver. The court may also direct payment to either party for such purpose of any sum due and owing from any person.

"The purpose of attorney fees in a divorce case is to assist the party, as necessary, so that the party can carry on or defend the action." *Black v. De Black*, 1 P.3d 1244, 1252 (Wyo. 2000) (citing *Hendrickson*, 583 P.2d at 1268, and *Prentice v. Prentice*, 568 P.2d 883, 886 (Wyo. 1977)). Attorney fees and costs "become 'necessary' . . . [when a] party has no choice but to incur [them] in defending against, or pursuing, a complaint for divorce." *McMurry*, ¶ 19, 245 P.3d at 322. The party requesting fees need not "prove financial necessity, nor is the award meant to punish the [other] party." *Id.*, ¶ 17, 245 P.3d at 321 (emphasis omitted) (citing *Black*, 1 P.3d at 1252, and *Hendrickson*, 583 P.2d at 1268). However, "[t]he party seeking to recover attorney's fees bears the burden of demonstrating the reasonableness of the fees and must also submit an itemized billing reflecting the time and rate charged." *Black*, 1 P.3d at 1252 (citing *Pekas v. Thompson*, 903 P.2d 532, 536 (Wyo. 1995), and *Hinckley v. Hinckley*, 812 P.2d 907, 915 (Wyo. 1991)).

[¶35] We see no abuse of discretion in the district court's attorney fee and costs award. Mother incurred significant fees and costs to (1) obtain financial support from Father, (2) prove Father was the anonymous texter, (3) demonstrate the value of NSE and Father's income from NSE, and (4) participate in mediation. It was reasonable for the district court to conclude these expenses were "necessary" because Mother had no choice but to incur them in prosecuting and defending the divorce. With respect to the reasonableness of the requested fees, Mother submitted itemized billings reflecting the time expended on each task and the billing rate. The district court found the billings to be accurate and fair and Father has not demonstrated otherwise. We cannot find the award of reduced attorney fees constituted an abuse of discretion.

### Child Support

[¶36] Father argues the district court erred in calculating his net monthly income for purposes of determining child support.

10

[¶37] "A district court has broad discretion in determining the correct amount of child support." *Marquis v. Marquis*, 2020 WY 141, ¶ 20, 476 P.3d 212, 218 (Wyo. 2020) (citing *Davidson v. Carrillo*, 2014 WY 65, ¶ 7, 325 P.3d 444, 446 (Wyo. 2014)). "Child support calculations are governed exclusively by statute." *Ackerman v. Ott*, 2014 WY 93, ¶¶ 8-9, 330 P.3d 271, 273 (Wyo. 2014) (citing *Ready v. Ready*, 2003 WY 121, ¶ 12, 76 P.3d 836, 839 (Wyo. 2003)). "The first step in calculating child support is to determine each parent's monthly income and net monthly income" under Wyo. Stat. Ann. § 20-2-303(a) (LexisNexis 2023). *Marquis*, ¶ 21, 476 P.3d at 218 (citing *Ackerman*, ¶ 9, 330 P.3d at 273). Section 20-2-303(a) defines "income" and "net income" as follows:

> (ii) "Income" means any form of payment or return in money or in kind to an individual, regardless of source. Income includes, but is not limited to wages, earnings, salary, commission, compensation as an independent contractor . . . and any other payments made by any payor . . . . In determining income, all reasonable unreimbursed legitimate business expenses shall be deducted. . . .
> (iii) "Net income" means income as defined in paragraph (ii) of this subsection less personal income taxes, social security deductions, cost of dependent health care coverage for all dependent children, other court-ordered support obligations currently being paid and mandatory pension deductions.

[¶38] The district court's child support award was based on its finding that Father's net monthly income was $15,423. To determine Father's net monthly income, the district court took the ordinary business income from NSE's tax return for 2019, added the depreciation deduction from that tax return back into that income, and then added that amount to the adjusted gross income from the parties' 2019 personal tax return. It did the same for tax years 2020 and 2021. It then took the average of these amounts and divided it by twelve months to arrive at Father's net monthly income. The district court explained it added the depreciation deductions back into NSE's ordinary business income because depreciation deductions for federal tax purposes do not require an actual expenditure, and therefore, they are not deductible from income as a "reasonable unreimbursed legitimate business expense" under § 20-2-303(a)(ii).

[¶39] Father presents a hodgepodge of arguments claiming the district court abused its discretion in determining his net monthly income when calculating his child support obligation. First, he maintains $8,800 should have been used as his monthly "income" because the undisputed evidence showed he only earned $8,800 per month from NSE. However, for purposes of calculating child support, "income" means "any form of payment or return in money or in kind to an individual, regardless of source. Income includes, but is not limited to wages, earnings, salary, commission, compensation as an independent contractor . . . and any other payments made by any payor . . . ." Section 20-2-303(a)(ii).

11

Father's argument ignores that his salary and owner's withdrawal represented only a portion of his "income." His other "income" remained in NSE's business bank account and at the time of the parties' separation and trial, the account contained $85,000 and $53,000, respectively. While Father testified this money was being saved for necessary maintenance on NSE's equipment and other operating expenses, he does not provide any argument or legal authority that these expenses are "reasonable unreimbursed legitimate business expense[s]" which should be deducted from his income. In any event, NSE's ordinary business income on its tax returns was calculated after taking deductions for "[r]epairs and maintenance."

[¶40]   Second, Father argues the district court erred in adding the depreciation deductions back into NSE's ordinary business income for purposes of calculating his net income. While he agrees depreciation can be added back into income to calculate child support, he claims a "reasonable unreimbursed legitimate business expense" is a defense to the addition of deprecation back into income and depreciation may not be counted if there is debt associated with the depreciated assets. He claims the depreciation deductions in this case actually represent the loan payments NSE makes on its equipment and the loan payments are "reasonable unreimbursed legitimate business expense[s]" which are deductible from income.

[¶41]   "When calculating a parent's child support obligation, the focus is whether an expense, including depreciation, is a 'reasonable unreimbursed legitimate business expense'" under § 20-2-303(a)(ii). *Marquis*, ¶ 25, 476 P.3d at 219 (citing *Watson v. Watson*, 2002 WY 180, ¶ 16, 60 P.3d 124, 128 (Wyo. 2002), and *Ackerman*, ¶ 11, 330 P.3d at 274). The party seeking to deduct depreciation as a "reasonable unreimbursed legitimate business expense" bears the burden of proof. *Id.* (citing *Watson*, ¶ 16, 60 P.3d at 128).

[¶42]   "'[T]he purpose of depreciation is to assist a person in **regaining** their expenditures[.]'" *Id.*, ¶ 26, 476 P.3d at 219 (emphasis in original) (quoting *Houston v. Smith*, 882 P.2d 240, 244 (Wyo. 1994)). Because it does not directly affect cash flow in later years, depreciation is not a "reasonable unreimbursed legitimate business expense" for calculating "income" under § 20-2-303(a)(ii). *Id. See also, Lemus v. Martinez*, 2019 WY 52, ¶ 24, 441 P.3d 831, 837 (Wyo. 2019) ("[W]hile amortized depreciation of business property is a legitimate deduction for federal income tax purposes, it is not deductible from a party's income as a 'reasonable unreimbursed legitimate business expense' to determine child support.") (citations omitted). On the other hand, "if debt financed the purchase of the depreciable asset, and the debt payments coincided with the depreciation of the asset," the depreciation may affect cash flow in that year and be considered a "reasonable unreimbursed business expense." *Marquis*, ¶ 29 & n.4, 476 P.3d at 220 n.4. Nevertheless, as we recognized in *Marquis*, "[t]his would be difficult to prove," and Father did not meet his burden in this case. *Id.* He testified NSE financed its semi-truck and trailers. NSE's accountant's report also indicated there was debt associated with the semi-truck and

trailers. However, there was no evidence showing any "debt payments coincided with the depreciation of [these] asset[s]."

[¶43] Relying on *Marquis*, Father argues that even if the district court properly added the depreciation deductions to NSE's ordinary business income, it should have only included 50 percent of the depreciation deductions because Mother owned the other 50 percent of NSE. In *Marquis*, however, the depreciation deduction at issue was taken by a company which the father shared with a third party. *Marquis*, ¶¶ 3-4, 476 P.3d at 215. In this case, Father was awarded NSE in the property division and its future income belongs solely to him. As a result, it was reasonable for the district court to add in all of the depreciation when calculating income from NSE.

[¶44] Father maintains adding depreciation to NSE's ordinary business income fails to accurately reflect his NSE income because NSE used an accelerated depreciation method. Father's argument is illogical. Our rules provide for adding back into business income depreciation that does not represent an actual business expenditure. The method used to calculate the depreciation makes no difference to the end result. Depreciation, whatever its amount, is added back in to accurately reflect the income of the business.

[¶45] Father also argues the district court's calculation of his net monthly income ignores that NSE's expenses have recently increased, making his future income less. As we stated above, the calculation of child support is within the district court's discretion. *Marquis*, ¶ 20, 476 P.3d at 218. Because the district court had objective historical evidence of Father's income from 2019-2021, and did not have objective evidence about future expenses, it was not an abuse of discretion to rely on the established historical income of NSE.

[¶46] Finally, Father claims the district court failed to reduce his income by the $225.00 health insurance premium he pays for the children each month. Father's assertion is incorrect. Under § 20-2-303(a)(iii), "'[n]et income' means income . . . less personal income taxes, social security deductions, [and] cost of dependent health care coverage for all dependent children[.]" The district court determined Father's net monthly income after deducting "federal income tax, social security, Medicare, and health insurance."

[¶47] We see no abuse of discretion in the district court's calculation of Father's net monthly income when determining child support.

### *Child Custody*

[¶48] We review the district court's custody decision for an abuse of discretion:

> Custody [and] visitation . . . are all committed to the sound
> discretion of the district court. . . . We do not overturn the

13

decision of the trial court unless we are persuaded of an abuse of discretion or the presence of a violation of some legal principle. . . .  A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. Our review entails evaluation of the sufficiency of the evidence to support the district court's decision, and we afford the prevailing party every favorable inference while omitting any consideration of evidence presented by the unsuccessful party. Findings of fact not supported by the evidence, contrary to the evidence, or against the great weight of the evidence cannot be sustained. Similarly, an abuse of discretion is present when a material factor deserving significant weight is ignored.

*Baer v. Baer*, 2022 WY 165, ¶ 18, 522 P.3d 628, 635 (Wyo. 2022) (citations omitted).

[¶49]  In awarding custody and visitation, the children's best interests are "paramount." *Johnson v. Johnson*, 2020 WY 18, ¶ 12, 458 P.3d 27, 32 (Wyo. 2020) (quoting *Arnott v. Arnott*, 2012 WY 167, ¶ 31, 293 P.3d 440, 455 (Wyo. 2012), and *Stonham v. Widiastuti*, 2003 WY 157, ¶ 17 n.8, 79 P.3d 1188, 1194 n.8 (Wyo. 2003)).  To determine the children's best interests, a district court must consider the following list of non-exclusive factors:

> (i) The quality of the relationship each child has with each parent;
> (ii) The ability of each parent to provide adequate care for each child throughout each period of responsibility, including arranging for each child's care by others as needed;
> (iii) The relative competency and fitness of each parent;
> (iv) Each parent's willingness to accept all responsibilities of parenting, including a willingness to accept care for each child at specified times and to relinquish care to the other parent at specified times;
> (v) How the parents and each child can best maintain and strengthen a relationship with each other;
> (vi) How the parents and each child interact and communicate with each other and how such interaction and communication may be improved;
> (vii) The ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right to privacy;
> (viii) Geographic distance between the parents' residences;

14

(ix) The current physical and mental ability of each parent to care for each child;

(x) Any other factors the court deems necessary and relevant.

Wyo. Stat. Ann. § 20-2-201(a) (LexisNexis 2023). "'No single factor is determinative,' and 'depending on the case, different factors will present a greater need for emphasis. The one constant is that the resolution must be in the [children's] best interests[.]'" *Johnson*, ¶ 12, 458 P.3d at 33 (quoting *Stevens*, ¶ 26, 318 P.3d at 811).

[¶50]   After considering the above statutory factors, the district court determined it was in HRH's and HAH's best interests for Mother to have custody. It considered most of the factors to be neutral. Section 20-2-201(a)(iv), (v), (vi), (vii), (viii), (ix). However, it found factors (i), (ii), and (iii) weighed in favor of awarding Mother custody. Father takes issue with the district court's conclusions on factors (i) through (v) and (vii). Father's arguments essentially ask us to reevaluate the evidence and make an independent decision about custody, rather than giving Mother's evidence every favorable inference and omitting consideration of his contrary evidence. When we apply our standard of review, we cannot find that the decision of the district court exceeded the bounds of reason under the circumstances. *Baer*, ¶ 18, 522 P.3d at 635.

### A.  Factor (i).  The quality of the relationship each child has with each parent.

The district court found the first factor weighed in favor of Mother because she "ha[d] been the [children's] primary caretaker."  It was undisputed that Mother had always been the children's primary caregiver and Father had limited time with the children because he worked out of town during the week.  "While not determinative, primary caregiver status is a weighty factor that the district court must consider." *Martin v. Hart*, 2018 WY 123, ¶ 22, 429 P.3d 56, 64 (Wyo. 2018).  Father acknowledges that Mother always had a good relationship with the children and provided more care because she was home with them full-time.  He argues that the district court should have concluded this factor to be neutral, as he improved his relationship with HRH since the parties' separation.  Applying our standard of review, however, we cannot conclude the district court's conclusion was against the great weight of the evidence or exceeded the bounds of reason.

### B.  Factor (ii).  The ability of each parent to provide adequate care.

The district court decided both parties had the ability to provide adequate care for HRH and HAH throughout their periods of responsibility, including arranging for each child's care by others as needed.  However, it weighed this factor "slightly" in favor of Mother because Father "ha[d] work

to do, in particular, work to improve his relationship with [HAH]" and needed "to provide a better place for the kids to live." Although Father wanted HAH to be comfortable enough to spend the night at his apartment, he did not have a bed for her. He indicated he could change jobs so he would not be on the road, but had not attempted to do so.

## C. Factor (iii). The relative competency and fitness of each parent.

The court found the third factor weighed in favor of Mother. It determined both parents were fit. Most concerning to the court was that Father had verbally abused Mother through the harassing text messages, which led Mother to present "as someone who is somewhat fragile and whose fragility impacts her parenting." Father disputes sending the messages, and once again asks us to make an independent decision based on his evidence, ignoring our standard of review. The district court found the evidence indicating Father sent the messages to be credible, and did not believe Father's alternate explanation. We defer to the court's determination because it was in the best position to assess witness credibility and weigh testimony. *Johnson v. Clifford*, 2018 WY 59, ¶ 8, 418 P.3d 819, 822-23 (Wyo. 2018) (citing *Drake v. McCulloh*, 2002 WY 50, ¶ 18, 43 P.3d 578, 584 (Wyo. 2002)). Applying our standard of review, it was reasonable for the district court to conclude as it did on factor (iii).

## D. Factor (iv). Each parent's willingness to accept all responsibilities of parenting and to relinquish care at specified times.

Father maintains the court erred in finding the fourth factor to be neutral when the evidence showed it weighed in his favor. He argues the evidence showed Mother was willing to accept the physical responsibilities of parenting but not its financial responsibilities. He urges us to ignore that Mother has attempted to get a job and actively developed a plan for self-employment, something we cannot do under our standard of review. He argues Mother was unwilling to provide visitation while she was in the safe house but ignores that she feared for herself and the children because of his threatening texts. There was evidence to reasonably support the district court's conclusion on factor (iv), and we cannot find it an abuse of discretion.

## E. Factors (v) and (vii). How the parents and each child can best maintain and strengthen relationships; the willingness of each parent to allow the other to provide care without intrusion.

Father contends the court should have weighed the fifth and seventh factors in his favor rather than as neutral. As with factor (iv), Father argues

the district court should have given more weight to Mother's actions while at the safe house. Again, he ignores our standard of review along with evidence supporting the district court's conclusion. The district court recognized strengths and weaknesses of each party, and the conclusion that each of these factors resulted in a neutral balance between the parties was not an abuse of discretion.

[¶51] Father claims the evidence supports the parties sharing custody of the children, which, he says, is the "most favorable custodial arrangement between parents and children." Father is incorrect that shared custody is legally the most favorable custody arrangement. In *Bruegman v. Bruegman*, 2018 WY 49, ¶¶ 13, 16, 417 P.3d 157, 162, 164 (Wyo. 2018), we reversed our precedent holding that shared custody was disfavored. However, we did not say that shared custody was the most favorable custodial arrangement. We merely determined "there is no presumption that shared custody is contrary to the best interests of the children and shared custody should be considered on an equal footing with other forms of custody." *Id.*, ¶ 16, 417 P.3d at 164. We reiterated that the focus when determining child custody is on choosing the custody arrangement which is in the best interests of the children. *Id.*

[¶52] As the district court aptly noted, determining custody "is one of the most difficult and demanding tasks assigned to a trial judge" because "[s]eldom, if ever, does a divorce court have a choice between a parent who is all good on one side and a parent who is all bad on the other side." "The practical result of a marriage dissolution is that parenting and family life will not be the same" and a district court's "objective is not to reconstruct a family that is no more, but to provide the framework for a new family that can best serve the children." Given the evidence, we cannot say the district court abused its discretion when determining the children's interests would best be served by awarding Mother custody.

### *Appellate Fees*

[¶53] Mother requests we order Father to pay her attorney fees and costs under Rule 10.05(b) of the Wyoming Rules of Appellate Procedure (W.R.A.P) and § 20-2-111. She seeks $10,886 in fees and $821.60 for costs.

[¶54] Rule 10.05(b) provides:

> (b) If the court certifies, whether in the opinion or upon motion, there was no reasonable cause for the appeal, a reasonable amount for attorneys' fees and damages to the appellee shall be fixed by the appellate court and taxed as part of the costs in the case. The amount for attorneys' fees shall not be less than one hundred dollars ($100.00) nor more than

17

ten thousand dollars ($10,000.00). The amount for damages to the appellee shall not exceed two thousand dollars ($2,000.00).

"Sanctions are not typically available when an appeal challenges a district court's discretionary ruling. . . . However, we will award sanctions in those rare circumstances where an appeal lacks cogent argument, there is an absence of pertinent legal authority to support the issues, or there is a failure to adequately cite to the record." *Montoya v. Navarette-Montoya*, 2005 WY 161, ¶ 9, 125 P.3d 265, 269 (Wyo. 2005) (citations and internal quotation marks omitted).

[¶55] Mother acknowledges we generally do not award attorney fees as a sanction under Rule 10.05(b) when an appeal challenges a discretionary ruling. Nevertheless, she contends Rule 10.05(b) sanctions are appropriate here because Father filed a frivolous brief making baseless challenges to the district court's order on custody and visitation, alimony, and property division. She also claims his brief lacks cogent argument and citation to the record. We decline to award Rule 10.05 sanctions. Father challenged only discretionary rulings and his brief, while at times missing record citations and citation to legal authority, raised cogent arguments.

[¶56] We further decline to award attorney fees under § 20-2-111.

## CONCLUSION

[¶57] The district court did not abuse its discretion by awarding Mother a majority of the marital property and ordering Father to pay alimony, Mother's American Express credit card debt, and $20,000 of her attorney fees. The district court did not abuse its discretion in calculating Father's net monthly income for purposes of determining child support or by granting Mother custody of the children. Each party should bear his or her own attorney fees incurred in this appeal. Mother is awarded costs under W.R.A.P. 10.05(a).

[¶58] Affirmed.