# THE SUPREME COURT, STATE OF WYOMING

# 2026 WY 41

APRIL TERM, A.D. 2026

April 14, 2026

RALPH WALTON CALLAWAY, JR.,

Appellant
(Plaintiff),

v.

MEGAN MOYNIHAN CALLAWAY,

Appellee
(Defendant).

S-25-0125, S-25-0172

*Appeal from the District Court of Teton County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Appellant:*

*Amanda K. Achord and Blake T. Godwin of Lonabaugh and Riggs, LLP, Sheridan, Wyoming.*

*Representing Appellee:*

*Rennie Phillips of Rennie Phillips Law, LLC, Victor, Idaho, and Janci L. Baxter of Baxter Law, LLP, Powell, Wyoming.*

*Guardian ad Litem:*

*Farrah L. Spencer of Long Reimer Winegar, LLP, Evanston, Wyoming. No appearance.*

*Before BOOMGAARDEN, C.J., and GRAY, FENN, JAROSH, and HILL, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FENN, Justice.**

[¶1]    This case presents an appeal from a divorce decree.  Ralph Walton Callaway, Jr., challenges the district court's decisions on custody, visitation, child support, and property division.  Mr. Callaway also challenges the district court's denial of his request to stay proceedings pending this appeal and its order "amending" the terms of the visitation order while this appeal was pending.  We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## ISSUES

[¶2]    Mr. Callaway raises the following issues, which we consolidate and rephrase as follows:

> I.    Did the district court err when it used its own hybrid approach to value Father's business interest and then used that value when making an equitable division of the parties' assets under Wyoming Statute § 20-2-114(a)?
>
> II.    Did the district court abuse its discretion when it made its custody decision?
>
> III.    Did the district court abuse its discretion by setting forth an indistinct visitation schedule?
>
> IV.    Did the district court correctly calculate child support?
>
> V.    Did the district court abuse its discretion when it denied Father's request to stay the proceedings pending appeal?
>
> VI.    Did the district court err when it amended the visitation order while the appeal was pending?

## FACTS

[¶3]    Ralph Walton Callaway, Jr. (Father), and Megan Moynihan Callaway (Mother) were married on July 21, 2012.  During the early part of their marriage, the parties split their time between New York City, New York, and Jackson, Wyoming.  Father founded Callaway Cloud Consulting, which "provides IT services that focus on configuring, programming and customizing the integration of customer relationship management platforms by building custom AI solutions for businesses, providing data engineering, offering audits of clients' cloud footprints, and recommending additional enhancements to their IT systems."  Mother worked in public relations.

1

[¶4]    When the parties decided to have children, they agreed to reside primarily in Jackson, Wyoming.   Mother's employer would not allow her to work remotely from Jackson, so she agreed to give up her career and focus exclusively on raising the children. During the course of their marriage, the parties had three children: GC, CC, and RC. Mother stayed home with the children while Father continued to expand Callaway Cloud.

[¶5]    The parties' relationship was often tumultuous, leading them to participate in marriage counseling for many years.   During these counseling sessions, the parties discussed incidents where Father physically intimidated Mother, punched holes in the bedroom door, broke a chair, and grabbed Mother's phone to prevent her from calling for help.  Father has been diagnosed with ADHD, and he has a history of self-medicating with alcohol, marijuana, and other substances.  On one such occasion, Father mixed alcohol with Xanax and crashed the parties' rental car while they were on vacation in Mexico. Mother also struggled with abusing alcohol, and she would use marijuana with Father.

[¶6]    Despite the parties' personal struggles and tumultuous relationship, Callaway Cloud became very successful, generating between $7–8 million a year in revenue at its peak between 2018 and 2022.   However, in 2023 Callaway Cloud's revenue declined approximately 60% when it lost its two largest clients.  Father stepped down from his role as CEO and was voluntarily furloughed from Callaway Cloud.

[¶7]    Father filed for divorce in September 2023.   Toward the end of October 2023, Mother filed a motion for an ex-parte protection order.  In mid-November 2023, the parties entered into a stipulated temporary custody order.  The parties agreed Mother would have primary physical custody of the children, and Father would have visitation with the children Wednesdays after school and on alternating weekends.  Mother also agreed to dismiss her motion for the protective order.  The parties maintained this custody and visitation schedule until May 2024 when the district court amended the temporary custody schedule, granting the parties shared custody on a week-on/week-off basis.  Also in May 2024, Mother announced her intention of relocating to Rye, New York, with the children.

[¶8]    Father accepted a job with the ski patrol at Snow King Resort in 2024, which pays $12,000 per ski season.  Father intended to return to Callaway Cloud as a developer in 2025, but he would be earning less than he did as CEO.  While the divorce was pending, Mother looked for available jobs in Jackson, but the only ones that were available paid between $25–30 an hour and did not come with any benefits. Mother was offered a position as the director of client relations for her mother's Visiting Angels franchise in Rye, New York.  She would receive a base salary of $110,000 per year, plus benefits, and she would have the option of purchasing an ownership interest in the company.

[¶9]    The district court held a four-day bench trial in December 2024.  After the trial, the district court issued a detailed, 71-page order.  The district court awarded the parties joint

legal custody of the children, but it awarded Mother primary physical custody. The district court also gave Mother the authority to make the final decision "independent of [Father's] objection" if the parties could not agree on any major decision. The district court awarded Father "up to 10 consecutive days of visitation each month in the Rye, New York area," and 5 consecutive weeks of visitation during the summers beginning in 2026. For purposes of child support, the district court found Father was voluntarily underemployed and imputed his net monthly income to $65,000, based on his previous years' tax returns. Based on the salary Mother would be earning once she moved to New York, which would be $6,817 per month, the district court calculated Father's child support obligation to be $10,900 per month.

[¶10] The district court valued the marital estate at $11,997,511. The largest assets were the marital home, Father's ownership interest in Callaway Cloud, and some brokerage accounts. The district court determined the marital home had equity of approximately $1,105,485. The district court valued Father's 74.5% interest in Callaway Cloud at $5,459,000. The district court awarded Mother assets totaling $5,783,341, which it estimated to be approximately 48.2% of the marital estate. The district court awarded Father his interest in Callaway Cloud and other assets totaling $6,214,170, which it estimated to be approximately 51.8% of the marital estate. Father was also awarded an additional $700,000 from a family inheritance. The district court then found it would be equitable to award Mother 55% of the marital assets because she had given up her career to move to Jackson and would be starting over after being out of the workforce for a decade. To achieve this equitable distribution, the district court ordered Father to pay Mother a cash equalization payment of $815,290. Father timely appealed.

[¶11] Father filed a request to stay the district court's order pending the appeal. The district court denied Father's motion. Father's appeal was docketed with this Court on June 2, 2025. On June 6, 2025, Father filed a motion to reconsider the denial of his motion to stay or for relief under Rule 60(b) of the Wyoming Rules of Civil Procedure (W.R.C.P.). The district court denied Father's motion for reconsideration.

[¶12] On June 25, 2025, Father filed a motion to "enforce" visitation. Father's motion indicated the parties disagreed about whether he could combine his visitation periods so that he would have a consecutive 20-day visit with the children. Father had notified Mother he intended to combine his visitation for July and August 2025, but she had already scheduled the children for a three-week overnight camp during this period and refused to reschedule. Father asked the district court to order Mother to allow him to have visitation with the children on his chosen consecutive dates in July and August and reschedule the camp. In response, Mother asserted there was no court ordered visitation to enforce because allowing Father to have 20 days of consecutive visitation was contrary to the district court's order. On July 9, 2025, the district court denied Father's motion to enforce. However, it "clarif[ied] the Order" and held "the scheduled monthly 10-day visitation cannot be combined with any previous or following month's 10-day visitation." Father

3

filed an amended notice of appeal, challenging the order denying his request for a stay and the order denying his request to enforce visitation.

# DISCUSSION

I. *Did The District Court Err When It Used Its Own Hybrid Approach To Value Father's Business Interest And Then Used That Value When Making An Equitable Division Of The Parties' Assets Under Wyoming Statute § 20-2-114(a)?*

[¶13] Father contends the district court's property division "is based on clearly erroneous findings and a studious avoidance of the relevant statutory factors." Father asserts the district court overvalued his interest in Callaway Cloud, then awarded Mother almost all of the parties' liquid assets "reasoning that she needed funds to find a new job and a new home in New York after Father forced her to move to Jackson and abandon her career." He claims the record does not support the district court's findings or conclusions, which resulted in "a shockingly inequitable and punitive division of the marital estate" that must be reversed.

[¶14] "We review the district court's division of marital property for an abuse of discretion, focusing on whether the court could reasonably conclude as it did." *Lewis v. Lewis*, 2025 WY 42, ¶ 17, 567 P.3d 58, 61 (Wyo. 2025) (quoting *Regan v. Regan*, 2024 WY 90, ¶ 6, 554 P.3d 383, 385 (Wyo. 2024)). "[W]e consider only the evidence in favor of the successful party, giving that party every reasonable inference that can be drawn from the record while ignoring the evidence of the unsuccessful party." *Amadio v. Amadio*, 2025 WY 21, ¶ 14, 564 P.3d 259, 265 (Wyo. 2025) (citing *Bloedow v. Maes-Bloedow*, 2024 WY 115, ¶ 11, 558 P.3d 576, 582 (Wyo. 2024)). "We will not disturb a property division in a divorce case, except on clear grounds, as the trial court is usually in a better position than the appellate court to judge the parties' needs and the merits of their positions." *Lewis*, ¶ 17, 567 P.3d at 61–62 (quoting *Metz v. Metz*, 2003 WY 3, ¶ 6, 61 P.3d 383, 385 (Wyo. 2003)). "An abuse of discretion occurs when the property disposition shocks the conscience of this Court and appears to be so unfair and inequitable that reasonable people cannot abide it." *Bloedow*, ¶ 12, 558 P.3d at 582 (quoting *Hyatt v. Hyatt,* 2023 WY 129, ¶ 11, 540 P.3d 873, 880 (Wyo. 2023)) (citation modified).

[¶15] Wyoming Statute § 20-2-114(a) (2023) governs the division of marital property in a divorce. That statute states, in relevant part:

> [I]n granting a divorce, the court shall make such disposition of the property of the parties as appears just and equitable, having regard for the respective merits of the parties and the condition in which they will be left by the divorce, the party through whom the property was acquired and the burdens

imposed upon the property for the benefit of either party and children.

All the parties' property is subject to distribution under Wyoming Statute § 20-2-114(a), including property owned prior to the marriage. *Bloedow*, 2024 WY 115, ¶ 16, 558 P.3d at 582 (citing *Hall v. Hall*, 2005 WY 116, ¶ 8, 125 P.3d 284, 287 (Wyo. 2005)). This Court has not set forth any specific guidelines as to how the district court should weigh the statutory considerations when making a property division. *Id.* (quoting *Hyatt*, 2023 WY 129, ¶ 16, 540 P.3d at 881). Wyoming Statute § 20-2-114(a) does not require an equal division of property, and we have recognized "a just and equitable division is as likely as not to be unequal." *Id.* at ¶ 16, 558 P.3d at 582–83 (quoting *Hyatt*, ¶ 16, 540 P.3d at 881). We evaluate the equity of a property division based on the overall distribution, not by narrowly focusing on the effect of any single disposition. *Id.* at ¶ 16, 558 P.3d at 583 (citing *Morrison v. Rubio,* 2022 WY 26, ¶ 19, 504 P.3d 251, 255–56 (Wyo. 2022)).

[¶16] This Court will not set aside the district court's findings of fact unless they are clearly erroneous. *Bloedow*, 2024 WY 115, ¶ 13, 558 P.3d at 582. "A finding is clearly erroneous if 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *Meiners v. Meiners,* 2019 WY 39, ¶ 8, 438 P.3d 1260, 1266 (Wyo. 2019)). "We will not substitute ourselves for the district court as finders of fact, and we will not re-weigh disputed evidence since the district court is in the best position to assess the witnesses' credibility and weigh their testimony." *Id.* (citing *Meiners*, ¶ 8, 438 P.3d at 1266).

### A. The Record Shows the District Court Clearly Erred When Valuing Father's Interest in Callaway Cloud.

[¶17] To equitably divide the parties' property, the district court had to determine the overall value of Callaway Cloud, the date it should use for that valuation, and Father's percentage of ownership on that date. Both parties presented expert testimony regarding the company's value. Father's expert used a valuation date of March 31, 2024, determined Father owned a 74.5% interest in the company on that date, and opined the value of his interest was $1,996,800. Mother's expert used a valuation date of December 31, 2023, determined Father's ownership interest was 77%, and concluded the value of Father's interest was $5.36 million. Both experts used similar income-based methods to value the company. However, Mother's expert projected stronger future growth for Callaway Cloud, applied a different discount rate, and included the company's $800,000 in cash reserves, which Father's expert excluded from his valuation.

[¶18] The district court used portions of each expert's opinion to arrive at its valuation of Callaway Cloud. The district court accepted what it called Father's expert's "nonmarketable value of equity" at $2,680,000 because it was based on the company's most recent financial data. However, it rejected many of his other calculations because

5

Father's expert admitted that many of the assumptions in his analysis were subjective and not supported by any research or data. The district court found Mother's expert "presented a more systematic and replicable approach overall for calculating fair market value." The district court concluded Mother's expert's opinion was better supported by research about this particular market and its anticipated growth. The district court also found it was appropriate to use the discount rate applied by Mother's expert due to the size of the company and the lack of debt. Additionally, the district court found it was appropriate to include the $800,000 of cash reserves because Father holds a controlling interest in the company and could modify the operating agreement to change the amount of cash the company is required to keep on hand. The district court accepted Father's expert's valuation date and held Father's ownership percentage on that date was 74.5%. After making these determinations, the district court concluded:

> [Father's expert] testified that his valuation is comparable to [Mother's expert's] valuation if the following were to occur: 1) one would take the nonmarketable value of the equity-- $2,680,000; 2) add the amount that [Father's expert] calculated for [Father's] ownership stake in Callaway Cloud--$1,997,000; and 3) add [Mother's expert's] additional amounts for revenue growth, the discount rate, and the cash on hand--$2,650,000. The [c]ourt is persuaded that this is a reasonable approach for establishing Callaway Cloud's value. The [c]ourt finds and holds that as of March 31, 2024, a reasonable fair market value for Callaway Cloud was $7,327,000. [Father's] 74.5% stake in Callaway Cloud when valued at $7,327,000 is $5,459,000.

[¶19] We have said:

> With respect to the valuation of marital assets, trial courts must exercise discretion and adjudicate marital property dispositions on a case-by-case basis using the best possible valuation method appropriate for that particular case.

*Houx v. Houx*, 2006 WY 102, ¶ 23, 140 P.3d 648, 654 (Wyo. 2006) (quoting *Wallop v. Wallop*, 2004 WY 46, ¶ 5, 88 P.3d 1022, 1024 (Wyo. 2004)). We have also recognized "[n]either judges nor juries are required to accept expert testimony when acting as the trier of fact." *ELA v. AAB*, 2016 WY 98, ¶ 15, 382 P.3d 45, 49 (Wyo. 2016) (citing *Kobos By and Through Kobos v. Everts*, 768 P.2d 534, [550–]51 (Wyo. 1989)). In determining the weight to be given to an expert's opinion, a judge may consider the expert's qualifications, credibility, information upon which the opinion is based, and the reason for the opinion, and may disregard any portion of the opinion they find to be unreasonable or not adequately supported. *Id.* (quoting W.C.P.J.I. 1.02D (2015)). While the district court's judgment is

entitled to great deference, this Court will not defer to valuation errors that affect the essence of the property settlement. *Neuman v. Neuman*, 842 P.2d 575, 583 (Wyo. 1992).

[¶20] When arriving at its valuation method, the district court attempted to use the portions of both experts' testimony it believed to be credible and adequately supported. However, the record shows the district court's methodology for valuing Callaway Cloud was ultimately erroneous. Contrary to the district court's finding, Father's expert never testified the value of Father's ownership interest should be added to his estimate of the "nonmarketable value of the equity." Instead, Father's expert testified as follows:

> A. Yeah, so the impact -- so what I did is I took [Mother's expert's] model and then I changed one variable at a time to see how his reconciled to mine. So as I mentioned, when I put my revenue and income projection into his model, his number dropped by about [$]1.8 million, then when I changed his equity discount rate to my equity discount rate it dropped by another $850,000, so those two changes account for most of the difference between my number and his.
>
> Q. Okay.
>
> A. And then the third thing was that he added back all of the cash and I didn't make that adjustment and that's about $800,000.

The $2,680,000 figure used by the district court was based on Father's expert's estimate for the value of a 100% interest in Callaway Cloud. The $1,997,000 figure reflected Father's expert's valuation of Father's 74.5% ownership interest in Callaway Cloud. By adding these figures together, the district court effectively reached a calculation that represented the value of a 174.5% ownership interest in Callaway Cloud. The district court then added the amounts representing the differences between the expert's future revenue projections, their different discount rates, and the company's cash reserves.[1] Because the district court improperly double counted Father's ownership interest, it failed to properly value this asset. *See Neuman*, 842 P.2d at 583 (citation omitted) (holding an error occurs when the trial court fails to properly value assets and thereby establishes a false net worth).

---

[1] We note there is a discrepancy between the amounts reflected in the testimony of Father's expert and the amount used by the district court in its order. Father's expert testified to three distinct differences between the valuations: 1) $1.8 million for the future revenue projections; 2) $850,000 for the discount rate; and 3) $800,000 for the cash reserves. The sum of three amounts equals $3,450,000. The district court used a figure of $2,650,000 to represent these sums. It is unclear from the record whether this was an intentional choice or an addition error.

[¶21]  Because the district court failed to properly value Callaway Cloud, which was one of the parties' significant assets, we must remand this case to the district court to determine the correct value of the business.

### B.  The Overall Distribution is Not Overly Punitive and Does Not Shock Our Conscience.

[¶22]  Father also contends the district court abused its discretion in its division of the parties' marital property because the order shows the district court's "intent to punish Father for what the court deemed to be his use of money to control Mother."

[¶23]  While the district court in its discretion may consider the fault of the respective parties when making a property division, "the division must not be done with the intent to punish one of the parties." *Morrison*, 2022 WY 26, ¶ 28, 504 P.3d at 257 (quoting *Breitenstine v. Breitenstine*, 2003 WY 16, ¶ 17, 62 P.3d 587, 592 (Wyo. 2003)). "[E]vidence of an intent to punish a party can be found in an unjust or inequitable property division." *Id.* (quoting *Breitenstine*, ¶ 17, 62 P.3d at 592).  Father asks us to determine the district court intended to punish him because it awarded Mother most of the parties' liquid assets, which required him to liquidate other assets to pay Mother the equalization payment.

[¶24]  The order shows the district court weighed the relevant statutory factors when dividing the parties' assets, and it does not show an intent to punish Father through an inequitable distribution.  "[Wyoming Statute] § 20-2-114(a) does not require the court to specifically address and make findings for each factor. It merely requires the court to have 'regard' for each factor when making a property division." *Regan*, 2024 WY 90, ¶ 12, 554 P.3d at 387.  In its lengthy written order, the district court specifically acknowledged it was obliged to consider the factors set out in Wyoming Statute § 20-2-114(a) when dividing the parties' property.  After identifying, valuing, and setting over various asset categories to one party or the other, the district court found the total value of the property set over to Father was 51.8% of the assets, and the value of the property set over to Mother was 48.2% of the assets.  The district court then determined Mother should be awarded a total of 55% of the assets because she would be "starting over after being out of the workforce for ten years."  It also concluded she needed to "find gainful employment and establish a residence for the children."  Because the parties had agreed to live in Jackson, Mother was precluded from working in her field of expertise and maintaining a network of colleagues and had "a long road to reestablish herself professionally."  The district court also decided an increased property award was appropriate because Mother would not be receiving spousal support.  These findings show the district court considered the position the parties would be left in after the divorce, as required by Wyoming Statute § 20-2-114(a).  They also show the district court considered the principle that an award of property is generally preferable to an award of alimony. *See Hyatt*, 2023 WY 129, ¶ 20, 540 P.3d at 882.

[¶25] The district court found Father had "totally controlled the finances" during the marriage, and he used "money to dominate control." The record supports these findings. Father knew Mother lacked access to the parties' brokerage accounts, and she was completely financially dependent on him. The district court awarded Mother liquid assets to prevent Father from exercising similar financial control in the future, not to punish him. Although Father may be required to sell some of the assets he was awarded, we have "approved cash awards to spouses despite the fact that there was insufficient cash in the marital estate to cover the judgment." *Bloedow*, ¶ 26, 558 P.3d at 585 (quoting *Bagley v. Bagley*, 2013 WY 126, ¶ 28, 311 P.3d 141, 150 (Wyo. 2013)).

[¶26] The district court considered each of the statutory factors under Wyoming Statute § 20-2-114(a), and the record supports its findings. Its overall property division is not so unfair and inequitable that reasonable people cannot abide it, nor does it shock our conscience. *See Regan*, 2024 WY 90, ¶ 15, 554 P.3d at 387. However, the district court's property division was based in large part on its improper valuation of Callaway Cloud. Arriving at an accurate valuation of Father's interest in the business is critical to determining the total value of the parties' assets, which in turn is essential to determining an equitable division of those assets. Because we are remanding this case to determine the correct value of Callaway Cloud, we must also remand the entire property division to allow the district court to make any adjustments it believes necessary to arrive at an equitable distribution.

## II. Did The District Court Abuse Its Discretion When It Made Its Custody Decision?

[¶27] Father asserts the district court's custody decision "improperly elevates Mother's desire to relocate over what is in the best interests of the children and violates Father's constitutional rights by requiring him to move to New York if he desires to maintain his relationship with the children." He asserts the district court's ruling promotes instability and is contrary to Wyoming law and the great weight of the evidence.

[¶28] "Whether a district court's custody order violates constitutional rights is a question of law that we review de novo." *Smith v. Smith*, 2025 WY 128, ¶ 13, 580 P.3d 507, 511 (Wyo. 2025) (quoting *Burbridge v. Dalin*, 2024 WY 119, ¶ 10, 558 P.3d 954, 957 (Wyo. 2024)). If the issue raised does not involve constitutional rights, "our review of the district court's custody decision is for an abuse of discretion." *Id.* (citing *Bailey v. Bailey*, 2024 WY 65, ¶ 6, 550 P.3d 537, 542 (Wyo. 2024)). "Judicial discretion is not absolute. 'Abuse occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them.'" *Id.* (quoting *Domenico v. Daniel*, 2024 WY 2, ¶ 29, 541 P.3d 420, 429–30 (Wyo. 2024)). "We consider the evidence presented in the light most favorable to the district court's decision, affording every favorable inference to the prevailing party and omitting from our consideration the conflicting evidence." *Id.*

(quoting *Amadio*, 2025 WY 21, ¶ 12, 564 P.3d at 264) (citation modified). We do not reweigh the evidence. *Id.* (quoting *Amadio*, 2025 WY 21, ¶ 12, 564 P.3d at 264).

[¶29] Both parents have a fundamental right to familial association with their children, and the children have a right to familial association with their parents. *See, e.g., Arnott v. Arnott*, 2012 WY 167, ¶ 30, 293 P.3d 440, 454 (Wyo. 2012) (quoting *In re MN,* 2007 WY 189, ¶ 7, 171 P.3d 1077, 1081 (Wyo. 2007)). Further, as this Court has recognized, both parents have a right to travel that is worthy of protection. *Id.* (citation modified). When making a custody determination, the district court is tasked with balancing these rights and arriving at an arrangement that is in the best interests of the children. *Id.* at ¶ 31, 293 P.3d at 454 ("[T]he best interests of the children are of overriding importance, and [] they take precedence over the fundamental rights of parents . . . ."). "Where circumstances involve two fit parents and one parent's fundamental right is pitted against the other parent's fundamental right, the "best interests" test in [Wyoming Statute] § 20-2-201(a) applies." *Smith*, 2025 WY 128, ¶ 19, 580 P.3d at 512 (citation modified). Whether the district court's custody determination violates Father's right to familial association depends entirely on whether that determination is in the best interests of the children.

[¶30] The legislature has set forth several factors the district court must consider when determining what custody arrangement is in the best interests of the children. Those factors include, but are not limited to:

(i)     The quality of the relationship each child has with each parent;

(ii)    The ability of each parent to provide adequate care for each child throughout each period of responsibility, including arranging for each child's care by others as needed;

(iii)   The relative competency and fitness of each parent;

(iv)    Each parent's willingness to accept all responsibilities of parenting, including a willingness to accept care for each child at specified times and to relinquish care to the other parent at specified times;

(v)     How the parents and each child can best maintain and strengthen a relationship with each other;

(vi)    How the parents and each child interact and communicate with each other and how such interaction and communication may be improved;

(vii)   The ability and willingness of each parent to allow the other to provide care without intrusion, respect the other parent's rights and responsibilities, including the right to privacy;

(viii)  Geographic distance between the parents' residences;

(ix)    The current physical and mental ability of each parent to care for each child;

(x)     Any other factors the court deems necessary and relevant.

Wyo. Stat. Ann. § 20-2-201(a) (2023).

[¶31]   In this case, the district court made over 20 pages of detailed findings on these statutory factors.  Mother's proposed relocation to New York was only one of several factors the court considered.  The district court considered evidence that showed Mother had been the children's primary caregiver for most of their lives.  The district court also considered the fact that the children had been "thriving" under the shared custody schedule. The district court took Father's history of substance abuse into consideration, and it was not persuaded that he had been sober since the filing of this divorce.  The district court concluded Father's "inability to understand that his substance abuse is not in the best interest of the children deeply undermines his competency" as a parent.  The district court also considered what the children's lives would be like if they relocated, and it found they would have "comparable, if not better, opportunities for education and activities" in New York, and the move would allow Mother and the children to live without Father's financial dominance.  The district court also considered the history of violence between the parties. Although Father fervently denied there had been any domestic violence, the district court found Father had "inflicted a dangerous relationship upon" Mother, and there did not need to be physical abuse in order for there to have been a dangerous relationship.  It concluded Father's "intimidation, outbursts, and property destruction demonstrated that he controlled the relationship in an abusive way."  After considering all the statutory factors, including Mother's reluctance to relinquish care of the children to Father, the district court concluded it was not in the best interests of the children to award primary custody to Father or to place the children in a shared custody arrangement that would require Mother to remain in Jackson.  The district court awarded primary custody to Mother, subject to visitation with Father.

[¶32]   The district court carefully analyzed each statutory factor, and it found four factors weighed in Mother's favor, three factors weighed in Father's favor, and the remaining three were neutral.  The district court ultimately concluded it was in the children's best interest

to award primary custody to Mother. The evidence cited in the district court's order supports its decision. Father essentially asks us to reweigh the evidence and find the "children's right to stability" required the district court to keep the children in Wyoming, either by giving him primary custody of the children or by forcing Mother to stay. Our standard of review precludes us from reweighing the evidence. *Amadio*, 2025 WY 21, ¶ 24, 564 P.3d at 267 (citing *Vassilopoulos v. Vassilopoulos*, 2024 WY 87, ¶ 7, 557 P.3d 725, 729 (Wyo. 2024)). Instead, we afford Mother every favorable inference while omitting consideration of the evidence presented by Father. *Vassilopoulos*, 2024 WY 87, ¶ 13, 557 P.3d at 730 (citation omitted). The record supports the district court's findings and provides a basis from which the district court could reasonably conclude it was in the children's best interests to award primary physical custody to Mother. We affirm the district court's custody decision.

### III. Did The District Court Abuse Its Discretion By Setting Forth An Indistinct Visitation Schedule?

[¶33] Father asserts the district court abused its discretion by crafting a visitation plan that lacks specificity and fails to comply with Wyoming Statute § 20-1-202(a)(i) (2023). Father claims the visitation order is indistinct because it "does not specify which 10 days each month Father may visit his children nor does it specify which weeks he may have in the summer."

[¶34] Wyoming Statute § 20-2-202(a)(i) requires a court to "[o]rder visitation in enough detail to promote understanding and compliance[.]" "The degree of detail must allow for parents to understand their obligations, and for the court to enforce the decree by contempt sanctions when necessary." *Edwards v. Edwards*, 2020 WY 35, ¶ 20, 459 P.3d 448, 452 (Wyo. 2020) (citing *IC v. DW*, 2015 WY 135, ¶ 21, 360 P.3d 999, 1005 (Wyo. 2015)). Visitation is committed to the sound discretion of the district court, and we will not overturn the trial court's decision unless we are persuaded it abused its discretion or violated some legal principle. *Id*. at ¶ 10, 459 P.3d at 450 (quoting *Johnson v. Johnson*, 2020 WY 18, ¶ 10, 458 P.3d 27[, 32] (Wyo. 2020)).

[¶35] We have previously reversed visitation orders that did not set forth any details about the visitation schedule and simply stated visitation would be "flexible" or in one parent's discretion. *See Long v. Long*, 2018 WY 26, ¶ 27, 413 P.3d 117, 126 (Wyo. 2018); *IC*, 2015 WY 135, ¶ 21, 360 P.3d at 1005. The provision at issue in this case does not suffer from this infirmity. On the contrary, the district court set forth detailed visitation provisions. Although the order in this case does not designate which days Father will have his 10-day visits or his 5-week visit in the summer, it "otherwise address[es] that deficiency by requiring Father to provide Mother timely notice of when he proposes to exercise visitation." *Edwards*, 2020 WY 35, ¶ 20, 459 P.3d at 452. If Father properly followed the notice procedure and asked for the visitation set forth in the decree, rather than some consolidated or combined visitation period, it would be simple for the court to enforce the

decree by contempt if necessary. The difficulty the parties have experienced post-decree comes from their varying interpretations of the order and their mutual unwillingness to compromise rather than any lack of specificity in the order.

[¶36] The district court did not craft a visitation plan that lacks specificity or fails to comply with Wyoming Statute § 20-1-202(a)(i). Therefore, it did not abuse its discretion when creating its visitation plan. We affirm the district court's visitation plan.

## IV.     Did The District Court Correctly Calculate Child Support?

[¶37] Father contends the district court incorrectly calculated his child support obligation. He claims the district court improperly calculated the parties' incomes, erred by failing to state the presumptive child support amount, and failed to consider the deviation factors.

[¶38] "We review a district court's child support decisions for an abuse of discretion." *Lewis*, 2025 WY 42, ¶ 11, 567 P.3d at 60 (quoting *Vassilopoulos*, 2024 WY 87, ¶ 14, 557 P.3d at 730). "In determining whether an abuse of discretion occurred, our core inquiry is the reasonableness of the district court's decision." *Id.* (quoting *Bagley*, 2013 WY 126, ¶ 6, 311 P.3d at 143). "Child support calculations are governed exclusively by [Wyoming Statute] §§ 20-2-301, *et seq.* (LexisNexis 2023)." *Bloedow*, 2024 WY 115, ¶ 29, 558 P.3d at 585. "The first step in calculating child support is to determine each parent's monthly income and monthly net income." *Id.* (citing *Ackerman v. Ott*, 2014 WY 93, ¶ 9, 330 P.3d 271, 273 (Wyo. 2014)). Wyoming Statute § 20-2-303 defines income and net income as:

> (ii) "Income" means any form of payment or return in money or in kind to an individual, regardless of source. Income includes, but is not limited to wages, earnings, salary, commission, compensation as an independent contractor, temporary total disability, permanent partial disability and permanent total disability worker's compensation payments, unemployment compensation, disability, annuity and retirement benefits, and any other payments made by any payor, but shall not include any earnings derived from overtime work unless the court, after considering all overtime earnings derived in the preceding twenty-four (24) month period, determines the overtime earnings can reasonably be expected to continue on a consistent basis. In determining income, all reasonable unreimbursed legitimate business expenses shall be deducted. Means tested sources of income such as Pell grants, aid under the personal opportunities with employment responsibilities (POWER) program, supplemental nutrition assistance program and supplemental security income (SSI) shall not be considered as income. **Gross**

13

**income also means potential income of parents who are voluntarily unemployed or underemployed**;

  (iii) "Net income" means income as defined in paragraph (ii) of this subsection less personal income taxes, social security deductions, cost of dependent health care coverage for all dependent children, actual payments being made under preexisting support orders for current support of other children, other court-ordered support obligations currently being paid and mandatory pension deductions. Payments towards child support arrearage shall not be deducted to arrive at net income;

Wyo. Stat. Ann. § 20-2-303(a)(ii)–(iii) (emphasis added).  The child support statutes also contain an express provision setting forth factors the district court must consider when deciding whether to impute income to a parent who is voluntarily "underemployed":

  (xi) Whether either parent is voluntarily unemployed or underemployed. In such case the child support shall be computed based upon the potential earning capacity (imputed income) of the unemployed or underemployed parent. In making that determination the court shall consider:

    (A) Prior employment experience and history;

    (B) Educational level and whether additional education would make the parent more self-sufficient or significantly increase the parent's income;

    (C) The presence of children of the marriage in the parent's home and its impact on the earnings of that parent;

    (D) Availability of employment for which the parent is qualified;

    (E) Prevailing wage rates in the local area;

    (F) Special skills or training; and

    (G) Whether the parent is realistically able to earn imputed income.

Wyo. Stat. Ann. § 20-2-307(b)(xi) (2023).

14

[¶39] The district court found Father was voluntarily underemployed because he voluntarily chose to take a furlough from Callaway Cloud, relinquished his CEO position, and was focused on recreational activities rather than pursuing possible revenue streams. When determining whether Father is voluntarily underemployed, we look at his "potential earning capacity" rather than his subjective intentions. *Bailey*, 2024 WY 65, ¶ 21, 550 P.3d at 545–46 (citation omitted). The district court did not abuse its discretion when it found Father continued to be capable of working more than he was at the time of the trial. The testimony established Father worked for Callaway Cloud between 4 and 30 hours per week, depending on whether he was working for Snow King Resort. Although Father attributed his reduced salary to decreased work at Callaway Cloud, he was not actively seeking new business and instead delegated that responsibility to a new CEO. He also acknowledged he could obtain other employment in the IT field if Callaway Cloud continued to perform poorly. In fact, Callaway Cloud employees are allowed to perform independent contractor work for other companies. Because the evidence showed Father had a greater "potential earning capacity" than he was realizing at the time of the divorce, the district court did not abuse its discretion when it found him to be voluntarily underemployed.

[¶40] However, the record does not support the district court's decision to impute Father's income to an amount that included large ownership distributions from Callaway Cloud that are not realistically likely to recur in the near future. From 2020 to 2022, Father's income was made up of three primary sources: 1) a base salary from Callaway Cloud that ranged from $130,000 to $135,000; 2) quarterly bonus payments that ranged from $20,800 to $43,318 annually; and 3) ownership distributions that ranged from $882,468 to $1,652,964. Then in 2023, when Callaway Cloud lost its two largest clients, Father did not receive an ownership distribution, and he and Mother were asked to make a $462,000 cash contribution into the company. The testimony established Callaway Cloud was on track to "break even" in 2024, but the company did not anticipate making any ownership distributions, and it was unclear if distributions would be made in 2025. Although both experts predicted future growth for Callaway Cloud, the timing and extent of that growth is far from certain. Because the record does not reflect that Father is realistically able to earn an amount equal to these previous ownership distributions, the district court abused its discretion when it included them in Father's imputed income. We must remand this matter to the district court to properly calculate Father's income, determine the presumptive child support amount, and decide whether any deviations from the presumptive support amount are appropriate.

[¶41] We also note, although the district court awarded Father more than 25% of the overnights with the children, it did not apply the shared responsibility child support obligation set forth in Wyoming Statute § 20-2-304(c) (2023). The district court did not make a specific finding that Father would not be contributing substantially to the children's expenses in addition to child support such that the shared responsibility child support obligation would be inappropriate. On remand, the district court must either apply the

15

shared responsibility child support calculation or explain why it is inappropriate in this case.

[¶42]   Finally, Father contends the district court abused its discretion by failing to consider whether he was entitled to a deviation from the statutory support amount.  The district court ordered Father to be fully responsible for the costs of transporting himself and the children to and from visitation.  Yet, it ordered him to pay the full amount of child support without discussing if any deviation was appropriate in light of the significant expenses he would incur to visit the children.  Wyoming Statute § 20-2-307 specifically allows a district court to deviate from the statutory presumptive support amount upon a finding that the application of the presumptive child support would be "unjust or inappropriate in that particular case." Wyo. Stat. Ann. § 20-2-307(b).  One of the factors the district court may consider is "[t]he cost of transportation of the child to and from visitation[.]" Wyo. Stat. Ann. § 20-2-307(b)(vii).  On remand, the district court should consider whether such a deviation is appropriate in this case.

### V.   Did The District Court Abuse Its Discretion When It Denied Father's Request To Stay The Proceedings On Appeal?

[¶43]    Father filed a motion to stay the order pending appeal on the grounds that he would suffer irreparable harm if it was implemented.  Mother opposed the motion, arguing the district court lacked authority to grant the stay under Wyoming Statute § 20-5-414 (2023).[2] The district court entered an order denying Father's motion, citing to Wyoming Statute § 20-5-414.  Father filed a motion for reconsideration, claiming Wyoming Statute § 20-5-414 was inapplicable because it only applies to the enforcement of custody orders, not initial custody decisions made under Wyoming Statute § 20-2-201.  The district court denied Father's motion to reconsider, finding its reference to Wyoming Statute § 20-5-414 "was neither persuasive nor determinative" when it entered the order, and it would have denied Father's motion for a stay even if the correct authority had been cited.  The district court further found: "The Court entered the child custody determination in this case is based upon the best interests of the children . . . .  The Court stands behind its analysis, findings on, and decision considering the children's best interests.  Likewise, denying the motion to stay is also in the children's best interest."

---

[2] Wyoming Statute § 20-5-414 states: "An appeal may be taken from a final order in a proceeding under this article in accordance with expedited appellate procedures in other civil cases.  Unless the court enters a temporary emergency order under W.S. 20-5-304, the enforcing court may not stay an order enforcing a child custody determination pending appeal."  The statute contains the limiting language "a proceeding under this article."  Wyoming Statutes §§ 20-5-401 et seq. apply to the enforcement and registration of child custody determinations made by "a court of another state" if that state exercised jurisdiction in substantial conformity with the Uniform Child Custody and Jurisdiction Act. *See, e.g.*, W.S. 20-5-403.  Father was appealing an initial custody determination made by a court of this state under Wyoming Statute § 20-2-201.

[¶44]   Father argues the district court did not analyze any factors relative to issuing a stay, and it should have weighed those factors "and determined that a stay to keep the status quo pending resolution of this appeal was proper."   Father also asserted it was an abuse of discretion to deny the stay "for all of the reasons Father argues above regarding the custody decision."   He essentially argued allowing Mother to move the children to New York interfered with his parenting time and promoted instability, which was not in the children's best interest.

[¶45]   Father asked the district court to grant a stay pursuant to Rule 4.02 of the Wyoming Rules of Appellate Procedure (W.R.A.P).  W.R.A.P. 4.02 states in relevant part:

> Whenever an appellant so entitled desires a stay on appeal, appellant may present to the trial court a supersedeas bond in such amount as shall be fixed by the trial court and with surety or sureties to be approved by the court or by the clerk of court. The bond shall be conditioned for the satisfaction of the judgment in full together with costs, interest, and damages for delay. . . .

W.R.A.P. 4.02(a) (2023).  Father did not offer any amount of supersedeas bond, summarily arguing "the judgment [was] not monetary so no bond should be required."

[¶46]   Citing federal law, Father asserts the district court should have considered the following factors when deciding whether to grant his motion to stay the order pending appeal: 1) his likelihood of success on the merits; 2) whether issuance of the stay will substantially injure other parties interested in the proceedings; and 3) where the public interest lies.  We have previously set forth factors to consider when determining whether to stay an action when there are proceedings pending in other jurisdictions. *See TEP Rocky Mountain LLC v. Rec. TJ Ranch Ltd. P'ship*, 2022 WY 105, ¶ 58, 516 P.3d 459, 477 (Wyo. 2022) (quoting *Rivermeadows, Inc. v. Zwaanshoek Holding & Financiering, B.V.,* 761 P.2d 662, 667 (Wyo. 1988)) (reviewing a district court's denial of a motion to stay state court proceedings pending a related federal court action and holding "[a]buse of discretion will be found if the trial court denies the stay under circumstances in which an injustice would be perpetrated on the party seeking the stay, and no hardship, prejudice or inconvenience would result to the party against whom it is sought").  However, this Court has not yet had the opportunity to articulate what factors a district court should consider when reviewing a motion to stay an order pending appeal.  We have stated a district court has discretion to deny a stay request, and "once this Court takes jurisdiction the right to a stay becomes one of right under W.R.A.P. 4.02(a)." *Bailey v. Bailey*, 954 P.2d 962, 968 (Wyo. 1998). However, *Bailey* did not describe what factors the district court should use when exercising its discretion. *Id.*

[¶47]   The case cited by Father, *McClendon v. City of Albuquerque,* involved a request for a stay from an order seeking relief from a permanent injunction. 79 F.3d 1014, 1017–1019 (10th Cir. 1996).  In *McClendon*, based on Tenth Circuit Rule 8.1, the federal court held it was required to consider: "(a) the likelihood of success on appeal; (b) the threat of irreparable harm if the stay or injunction is not granted; (c) the absence of harm to opposing parties if the stay or injunction is granted; and (d) any risk of harm to the public interest." *Id.* at 1020 (citing 10th Cir. R. 8.1).  The case presently before the Court does not involve an injunction, and the federal rule that applied in *McClendon* is vastly different than W.R.A.P. 4.02.  Father did not present any argument in his brief or in his motion below showing why Wyoming should adopt these factors, especially in cases dealing with child custody determinations.

[¶48]   Some other states allow a trial court to grant a stay pending an appeal in a custody matter only if doing so is in the best interests of the children. *See Rek v. Pettit*, 280 A.3d 1260, 1266–67 (Conn. App. 2022) (stating Connecticut's rules allow a court to impose a stay in family matters after considering the following factors: "(1) the needs and interests of the parties, their children and any other persons affected by such order; (2) the potential prejudice that may be caused to the parties, their children and any other persons affected, if a stay is entered, not entered or is terminated . . . ; (4) the need to preserve the rights of the party taking the appeal to obtain effective relief if the appeal is successful . . . ; and (6) any other factors affecting the equity of the parties"); *Sanchez v. Sanchez*, 178 Cal. App. 2d 810, 813–14, (Cal. Ct. App. 1960) (holding a court should consider whether the best interests of the children will be attained by the immediate change or continuation of custody, taking into consideration the probability of error in the appealed decision, and whether the order can be effectuated without harm to the children); *Alpers v. Alpers*, 806 P.2d 1057, 1059–60 (N.M. 1990) (holding the following factors should be considered before granting a stay pending appeal in a custody case: "(1) the likelihood of hardship or harm to the children if the stay is denied; (2) whether the appeal is taken in good faith and the issues raised are not frivolous; (3) the potential harm to the interests of the non-moving party if the stay is granted; and (4) a determination of other existing equitable considerations, if any").  While the district court's order denying Father's motion for reconsideration of the denial of his request for a stay did not contain a lengthy recitation of the factors the court considered when making its decision, the order did say "denying the motion to stay is also in the children's best interest."  Therefore, the order reflects the district court considered the children's best interest when making its decision.

[¶49]   Because of the lack of adequate briefing and development of this issue below, we are reluctant to announce any rules governing the granting or denial of stays in future matters.  However, given the dearth of guidance our precedent provided to the district court and the lack of persuasive or binding authority provided by the parties in their motions, we cannot say the district court abused its discretion when it denied Father's request for a stay after determining a stay was not in the children's best interest.

## VI. Did The District Court Err When It "Amended" The Visitation Order While The Appeal Was Pending?

[¶50] While this appeal was pending, Father filed what he captioned as a motion to enforce visitation. He informed the district court he planned to consolidate his 10-day visitation periods for July and August 2025 into a single 20-day period. Mother had already signed the children up for a three-week overnight camp during the days Father had selected, without consulting him. Mother was refusing to reschedule the camp to accommodate Father's chosen visitation schedule. Father asked the district court to order Mother to reschedule the camp and allow him to have visitation with the children during his chosen 20-day period. In response, Mother asserted there was nothing in the order that allowed Father to combine his 10-day visits, so there was no visitation for the court to enforce. She asked the district court to deny Father's motion and allow the children to attend the scheduled camp.

[¶51] The district court entered an order denying Father motion to enforce visitation. The district court reiterated that it had awarded Father 10 consecutive days of visitation each month to "as close as possible, approximate the bi-weekly visits that he and the children enjoyed while they all lived near each other." However, it also intended to "recognize [Mother] as the primary caregiver, who must build regularity in the children's schedules during the remaining days each month." The district court admitted it had "failed to anticipate and specifically allow or prohibit every possible iteration of visitation the Parties may conjure." To "assist the Parties," the district court clarified the order and held Father's 10-day visits could not be combined with the previous or following month's 10-day visit. It further clarified that Father's five consecutive weeks of visitation beginning in the summer of 2026 could not be combined with his monthly 10 days of visitation.

[¶52] Father claims this clarification was actually a modification, and the district court erred when it modified the visitation plan sua sponte while this appeal was pending. He asserts the district court lacked jurisdiction to do so once the appeal was docketed. Father also asserts that if the district court had jurisdiction, its reasoning for denying his motion and sua sponte modifying the visitation order was not reasonable or sound.

[¶53] The district court did not specify which rule it was relying on when it clarified the visitation schedule. It appears from a review of the order that the district court approached the proceedings as a clarification of an ambiguous divorce decree, thereby implicitly invoking W.R.C.P. 60(a). *See Tafoya v. Tafoya*, 2013 WY 121, ¶ 9, 309 P.3d 1236, 1239 (Wyo. 2013). Rule 60(a) allows a court to "correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." W.R.C.P. 60(a). The district court may do so on its own motion, with or without notice. *Id.* We have recognized Rule 60(a) can be utilized to dispel ambiguities in the record, whether that ambiguity is patent or latent. *Id.* at ¶ 11, 309 P.3d at 1239 (quoting *Spomer v. Spomer,* 580 P.2d 1146, 1149 (Wyo. 1978)). "Where the intention of the court

is not evident or apparent, Rule 60(a) can be used to clarify the meaning to conform to the contemporaneous intentions of the court as then expressed." *Id.* (quoting *Spomer,* 580 P.2d at 1149). However, Rule 60(a) also states: "after an appeal has been docketed in the Supreme Court, and while it is pending, such a mistake may be corrected only with leave of the Supreme Court." The appeal in this case was docketed on June 2, 2025, thereby placing jurisdiction with this Court. The district court entered its clarification order on July 9, 2025, more than a month later. The district court did not seek leave from this Court to correct any mistake or omission in the order pursuant to Rule 60(a). Therefore, the district court lacked jurisdiction to make any clarifications at that time.

## CONCLUSION

[¶54]   The district court did not violate Father's constitutional right to associate with his children, and it did not abuse its discretion when it awarded primary custody of the children to Mother. The district court did not create an indistinct visitation schedule. We affirm these portions of the district court's order.

[¶55]   The district court improperly calculated Father's income, failed to apply the shared-responsibility child support amount or explain why it was inappropriate, and did not consider whether a deviation from the presumptive support amount was appropriate. We reverse the district court's child support award and remand for further proceedings consistent with this opinion.

[¶56]   The district court improperly valued Callaway Cloud by double counting the value of Father's interest in the company. Arriving at an accurate valuation of Father's interest in the business is critical to determining the total value of the parties' assets, which is essential to determining an equitable division of those assets. We reverse the district court's property division and remand for further proceedings consistent with this opinion.

[¶57]   The district court entered an order denying Father's motion to enforce visitation, which was intended to clarify the visitation provisions, after the appeal was docketed. Because the district court did not obtain leave from this Court before issuing the clarification, it lacked jurisdiction to do so under W.R.C.P. 60(a).

20